## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **GREGORY REAUX** | **CIVIL ACTION** |
| **VERSUS** | **NO. 19-2529** |
| **DARREL VANNOY, WARDEN** | **SECTION: "E"(1)** |

### REPORT AND RECOMMENDATION

Petitioner, Gregory Reaux, a Louisiana state prisoner, filed this federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254. For the following reasons, it is recommended that the application be **DISMISSED WITH PREJUDICE**.

On July 24, 2013, petitioner was convicted of three counts of armed robbery under Louisiana law.[1] On September 4, 2013, he was sentenced on each count to a term of ninety-nine years imprisonment. It was ordered that those sentences be served consecutively and without benefit of parole, probation, or suspension of sentence.[2] On November 25, 2014, the Louisiana Fifth Circuit Court of Appeal affirmed his convictions and sentences.[3] The Louisiana Supreme Court then denied his related writ application on October 9, 2015.[4]

Petitioner filed an application for post-conviction relief with the state district court on January 25, 2016,[5] and a supplemental application on February 4, 2016.[6] The state district court

---

[1] State Rec., Vol. 6 of 7, transcript of July 24, 2013, p. 163; State Rec., Vol. 2 of 7, minute entry dated July 24, 2013; State Rec., Vol. 2 of 7, jury verdict form.
[2] State Rec., Vol. 6 of 7, transcript of September 4, 2013; State Rec., Vol. 2 of 7, minute entry dated September 4, 2013.
[3] State v. Reaux, 165 So. 3d 944 (La. App. 5th Cir. 2014); State Rec., Vol. 2 of 7.
[4] State v. Reaux, 178 So. 3d 1000 (La. 2015); State Rec., Vol. 2 of 7.
[5] State Rec., Vol. 2 of 7. Federal habeas courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing by a *pro se* prisoner, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system." Causey v. Cain, 450 F.3d 601, 607 (5th Cir. 2006). Because that date cannot be gleaned from the state court record with respect to any of petitioner's various *pro se* filings in the instant case, the Court will simply use the signature dates of the applications as the filing dates, in that the applications were obviously placed in the mail no earlier than the date they were signed.
[6] State Rec., Vol. 3 of 7.

denied relief on July 27, 2016.[7]  Petitioner's related writ applications were then likewise denied

by the Louisiana Fifth Circuit Court of Appeal on December 2, 2016,[8] and the Louisiana Supreme

Court on April 6, 2018.[9]

On March 18, 2019, petitioner filed this federal application seeking habeas corpus relief

pursuant to 28 U.S.C. § 2254.[10]  The state filed a response arguing that the application is

untimely,[11] and petitioner filed a reply to that response.[12]

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a petitioner

is generally required to bring his § 2254 claims within one (1) year of the date on which his

underlying state criminal judgment became "final."  28 U.S.C. § 2244(d)(1)(A).[13]  With respect to

determining the date of finality, the United States Fifth Circuit Court of Appeals has explained:

> The statute of limitations for bringing a federal habeas petition challenging
> a state conviction begins to run on "the date on which the [state] judgment became
> final by the conclusion of direct review or the expiration of the time for seeking
> such review."  28 U.S.C. § 2244(d)(1)(A).  When a habeas petitioner has pursued
> relief on direct appeal through his state's highest court, his conviction becomes
> final ninety days after the highest court's judgment is entered, upon the expiration
> of time for filing an application for writ of certiorari with the United States Supreme
> Court.  Roberts v. Cockrell, 319 F.3d 690, 693 (5th Cir. 2003).

Butler v. Cain, 533 F.3d 314, 317 (5th Cir. 2008).

As noted, the Louisiana Supreme Court denied petitioner's direct-review writ application

on October 9, 2015.  Therefore, his state criminal judgment became final for AEDPA purposes on

---

[7] State Rec., Vol. 3 of 7, Order dated July 27, 2016.

[8] Reaux v. Cain, No. 16-KH-638 (La. App. 5th Cir. Dec. 2, 2016); State Rec., Vol. 3 of 7.

[9] State ex rel. Reaux v. State, 239 So. 3d 277 (La. 2018); State Rec., Vol. 3 of 7.

[10] Rec. Doc. 4.  "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court."  Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003).  The date that occurred in the instant case is not indicated; therefore, again, the Court will assume that the application was delivered to prison authorities on the date it was signed.

[11] Rec. Doc. 11.

[12] Rec. Doc. 12.

[13] Although 28 U.S.C. § 2244(d)(1) has alternative provisions providing for other events that can trigger a delayed commencement of the statute of limitations in some circumstances, those alternative provisions are not applicable in the instant case.

2

January 7, 2016.  As a result, his federal limitations period commenced on that date and then expired one year later, unless that deadline was extended through tolling.

The Court first considers statutory tolling.  Regarding the statute of limitations provided in § 2244, the AEDPA expressly states:  "The time during which a *properly* filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."  28 U.S.C. § 2244(d)(2) (emphasis added).  The United States Supreme Court has explained:

> [A]n application is "*properly* filed" when its delivery and acceptance are in compliance with the applicable laws and rules governing filings.  These usually prescribe, for example, the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee.

Artuz v. Bennett, 531 U.S. 4, 8 (2000).

Further, once a prisoner properly files a post-conviction application, that application remains "pending" for the purposes of § 2244(d)(2) for the duration of the post-conviction proceedings, *so long as* he continues to seek review at the higher levels of the state court system in a timely manner.  Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 769-71 (5th Cir. 2004).  However, if he fails to proceed to a higher level of review in a timely fashion, then his application ceases to be "pending" for the purposes of § 2244(d)(2) when his time for seeking such review expires.  Melancon v. Kaylo, 259 F.3d 401, 406 (5th Cir. 2001).

Here, after seventeen (17) days elapsed, petitioner tolled his federal limitations period by filing a post-conviction application with the state district court on January 25, 2016.  After the state district court denied relief on July 27, 2016, petitioner attempted to seek further review; however, due to his counsel's errors, the related filings with the intermediate appellate courts do not qualify for § 2244(d)(2) tolling for the following reasons.

Counsel initially filed a writ application with the Louisiana **First** Circuit Court of Appeal on September 12, 2016.[14]  However, that court lacked jurisdiction over the case; rather, state law required that the application be filed in the Louisiana **Fifth** Circuit Court of Appeal.[15]  No tolling applies where, as here, an application is filed in the wrong court.  See Artuz v. Bennett, 531 U.S. 4, 9 (2000) (noting that an application "erroneously accepted by the clerk of a court lacking jurisdiction" is not *"properly filed"*); Larry v. Dretke, 361 F.3d 890, 893 (5th Cir. 2004) ("[A] habeas petition filed in a court lacking jurisdiction to consider the application is not 'properly filed' ....."); Marshall v. Department of Corrections, Civ. Action No. 18-6577, 2018 WL 6072246, at *4 (E.D. La. Oct. 26, 2018) ("It is clear that state applications filed in the wrong court do not qualify as 'properly filed' for purposes of § 2244(d)(2), and, therefore, do not toll the AEDPA statute of limitations."), adopted, 2018 WL 6068061 (E.D. La. Nov. 20, 2018); Brian R. Means, Federal Habeas Manual § 9A:53 (2019) ("The statute of limitations is not tolled where the petition was filed in the wrong state court.").

When petitioner's counsel discovered the mistake, he then filed a writ application with the Louisiana Fifth Circuit Court of Appeal on November 3, 2016.[16]  However, on December 2, 2016, the Louisiana Fifth Circuit Court of Appeal denied that application as untimely.[17]  Therefore, that application likewise did not toll the federal limitations period because the United States Supreme Court has expressly held that time limits are conditions of filing, and so an *untimely* state application cannot be deemed "properly filed" for the purposes of § 2244(d)(2).  Pace v. DiGuglielmo, 544 U.S. 408, 413 (2005).  Rather:  "When a postconviction petition is untimely under state law, that is the end of the matter for purposes of § 2244(d)(2)."  Id. at 414 (quotation

---

[14] See Rec. Doc. 4-3, p. 53.
[15] See La. Const. Art. 5, § 10(A); La. Rev. Stat. Ann. § 13:312(5).
[16] See Rec. Doc. 4-4, p. 26.
[17] Reaux v. Cain, No. 16-KH-638 (La. App. 5th Cir. Dec. 2, 2016); State Rec., Vol. 3 of 7.

marks and brackets omitted).  Accordingly, where, as here, a petitioner's writ application has been rejected by the state court as untimely, he is entitled to no statutory tolling whatsoever for that writ application.  See, e.g., Bruce v. Deville, Civ. Action No. 18-5323, 2019 WL 1062466, at *5 ("Because the Louisiana Fifth Circuit Court of Appeal expressly found that the writ application relating to the denial of his supplemental application for post-conviction relief was untimely and refused to consider it on that basis, petitioner receives no tolling credit whatsoever for that application."), adopted, 2019 WL 1056854 (E.D. La. Mar. 6, 2019); Murphy v. Cooper, Civ. Action No. 12-1339, 2012 WL 5463864, at *3-4 (E.D. La. Oct. 1, 2002), adopted, 2012 WL 5463857 (E.D. La. Nov. 8, 2012).[18]

Because petitioner failed to properly file a writ application with the correct Court of Appeal in a timely fashion in accordance with state law, his state post-conviction application ceased to be "pending," and his federal limitations period therefore resumed running, on August 26, 2016, when his time expired for seeking review of the district court's July 27 ruling denying post-conviction relief.[19]  See Bruce, 2019 WL 1062466, at *5.

Nevertheless, at that point, petitioner still had three hundred forty-eight (348) days of his federal limitations period remaining.  Moreover, after another one hundred twenty-four (124) days

---

[18] The undersigned is aware that, in the instant case, the Louisiana Fifth Circuit Court of Appeal also alternatively held that petitioner's claims had no merit in any event; however, that alternative holding is immaterial.  "[A]n unambiguous ruling by the state court that a state habeas application is untimely, regardless of whether the state court nonetheless reached the merits, ends our inquiry, because a state application ceases to be pending when the time for appellate review expires."  Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 771 (5th Cir. 2004).

[19] A litigant has thirty days to seek review by a Louisiana Court of Appeal.  See Louisiana Uniform Rules of the Courts of Appeal Rule 4-3; see also Melancon v. Kaylo, 259 F.3d 401, 404 (5th Cir. 2001); Campbell v. Cain, Civ. Action No. 06-3983, 2007 WL 2363149, at *3 n.24 (E.D. La. Aug. 15, 2007).

 The Court notes that petitioner alleges that he had additional time to file a writ application due to flooding in the state.  He does not explain or offer legal authority for that allegation, and the state does not address the issue in its response.  However, it appears that petitioner may be referring to the Governor's extension of deadlines as provided in Executive Orders Nos. JBE 2016-53, JBE 2016-57, and JEB 2016-66.  Those executive orders suspended certain legal deadlines from August 12, 2016, through August 19, September 9, or September 30, 2016.  Nonetheless, the Court notes that, even if those orders were applicable and did in fact extend petitioner's writ application deadline, the additional days he gained thereby would still be insufficient to render his federal application timely.

elapsed, petitioner again tolled the federal limitations period on December 29, 2016, by filing a

writ application with the Louisiana Supreme Court to challenge the Louisiana Fifth Circuit Court

of Appeal's denial of relief.[20]  When the Louisiana Supreme Court then denied relief on April 6,

2018, the federal limitations period again resumed running.[21]

As of that date, petitioner still had two hundred twenty-four (224) days of his federal

limitations period remaining.  Accordingly, he had until November 16, 2018, either to again toll

the limitations period or to file his federal application.

Petitioner had no other applications pending before the state courts at any time on or before

November 16, 2018.  Therefore, he clearly is not entitled to further statutory tolling.

The Court must next consider equitable tolling.  The United States Supreme Court has

expressly held that the AEDPA's statute of limitations is subject to equitable tolling.  Holland v.

Florida, 560 U.S. 631, 645 (2010).  However, "equitable tolling is unavailable in most cases …."

Miles v. Prunty, 187 F.3d 1104, 1107 (9th Cir. 1999); accord Davis v. Johnson, 158 F.3d 806, 811

(5th Cir. 1998) (holding that the AEDPA's statute of limitations can be equitably tolled "in *rare*

*and exceptional* circumstances" (emphasis added)).  Indeed, the Supreme Court held that "a

petitioner is entitled to equitable tolling only if he shows both that (1) he has been pursuing his

rights *diligently*, and (2) some *extraordinary* circumstance stood in his way and *prevented* timely

filing." Holland, 560 U.S. at 649 (emphasis added; internal quotation marks omitted).  Regarding

those two components, the United States Supreme Court has explained:

---

[20] State Rec., Vol. 7 of 7, writ application in case number 17 KH 66.  In its response, the state concedes that this
application tolled the federal statute of limitations. Rec. Doc. 11, p. 13.  Because it makes no difference in the instant
case, the undersigned will accept that concession, despite the existence of a possible argument to the contrary.  See
Robinson v. Cain, Civ. Action No. 15-1551, 2016 WL 6902114, at *5 (E.D. La. Oct. 25, 2016), adopted, 2016
WL6892870 (E.D. La. Nov. 23, 2016); Murphy v. Cooper, Civ. Action No. 12-1339, 2012 WL 5463864, at *3-4 (E.D.
La. Oct. 1, 2002), adopted, 2012 WL 5463857 (E.D. La. Nov. 8, 2012).
[21] A petitioner receives no additional tolling credit for the period during which he could have sought review by the
United States Supreme Court with respect to the denial of post-conviction relief.  Lawrence v. Florida, 549 U.S. 327,
332 (2007); Ott v. Johnson, 192 F.3d 510, 512-13 (5th Cir. 1999).

> [W]e have expressly characterized equitable tolling's two components as "elements," not merely factors of indeterminate or commensurable weight. Pace v. DiGuglielmo, 544 U.S. 408, 418, 125 S.Ct. 1807, 161 L.Ed.2d 669 (2005) ("Generally, a litigant seeking equitable tolling bears the burden of establishing two elements"). And we have treated the two requirements as distinct elements in practice, too, rejecting requests for equitable tolling where a litigant failed to satisfy one without addressing whether he satisfied the other. See, e.g., Lawrence v. Florida, 549 U.S. 327, 336-337, 127 S.Ct. 1079, 166 L.Ed.2d 924 (2007) (rejecting equitable tolling without addressing diligence because habeas petitioner fell "far short of showing 'extraordinary circumstances'"); Pace, supra, at 418, 125 S.Ct. 1807 (holding, without resolving litigant's argument that he had "satisfied the extraordinary circumstance test," that, "[e]ven if we were to accept [his argument], he would not be entitled to relief because he has not established the requisite diligence").

Menominee Indian Tribe of Wisconsin v. United States, 136 S. Ct. 750, 756 (2016).[22] A petitioner bears the burden of proof to establish entitlement to equitable tolling. Alexander v. Cockrell, 294 F.3d 626, 629 (5th Cir. 2002).

In the instant case, petitioner argues that his untimeliness should be excused due to his attorney's error in failing to file a timely writ application with the correct Louisiana Court of Appeal after the state district court denied post-conviction relief.[23] However, the Court rejects that argument on three bases: (1) counsel's error did not constitute an "extraordinary circumstance"; (2) that error did not "prevent" petitioner from seeking federal relief in a timely fashion; and (3) petitioner did not pursue federal relief diligently.

---

[22] Menominee Indian Tribe was not a habeas corpus case. However, its equitable tolling discussion is expressly based on the Supreme Court's interpretation of Holland; therefore, the reasoning therein is applicable to habeas cases. See, e.g., Brian R. Means, Federal Habeas Manual § 9A:83 (2019).

[23] Specifically, petitioner argues that his application should be considered timely in light of Martinez v. Ryan, 566 U.S. 1 (2012). See Rec. Doc. 12, pp. 3-4. However, Martinez is inapplicable here. Martinez concerned procedural default in federal habeas cases, not the AEDPA's statute of limitations. See Arthur v. Thomas, 739 F.3d 611, 631 (11th Cir. 2014) ("[W]e also hold that the reasoning of the Martinez rule does not apply to AEDPA's limitations period in § 2254 cases or any potential tolling of that period."); Alexander v. Vannoy, Civ. Action No. 18-5019, 2019 WL 1086389, at *8 n.27(E.D. La. Jan. 31, 2019), adopted, 2019 WL 1077189 (E.D. La. Mar. 7, 2019); Smith v. Rogers, No. 14-0482, 2014 WL 2972884, at * 1 (W.D. La. July 2, 2014); Falls v. Cain, No. 13-5091, 2014 WL 2702380, at *3 (E.D. La. June 13, 2014). However, this Court will broadly construe petitioner's argument as one for equitable tolling.

In this Circuit, it has long been held that attorney error normally does not constitute an extraordinary circumstance warranting equitable tolling. See, e.g., Cousin v. Lensing, 310 F.3d 843, 848 (5th Cir. 2002) ("Many courts have considered the question whether attorney error constitutes 'rare and exceptional circumstances' and have held that it does not. Additional support for the proposition that attorney error does not trigger equitable tolling is the longstanding rule that prisoners are not entitled to counsel during habeas proceedings and thus cannot state a claim for ineffective assistance during those proceedings." (footnote omitted)); see also United States v. Riggs, 314 F.3d 796, 799 (5th Cir. 2002) ("If there was ever any doubt that an attorney's error or neglect does not warrant equitable tolling, our recent decision in Cousin ... erased it ....").

It is true that the United States Supreme Court has carved out a limited exception to that general rule, holding that, while a "garden variety claim of misconduct" does not warrant equitable tolling, such tolling may be warranted by "far more serious instances of attorney misconduct." See Holland, 560 U.S. at 651-52. However, counsel's conduct in this case did not rise to that level.

As an initial matter, the errors here do not even begin to approach the level of misconduct recounted in Holland. In Holland, there was an almost complete breakdown in communication between Holland and his counsel. For example, for a two-year period during which post-conviction relief was being sought in the state courts, the attorney "communicated with Holland only three times – each time by letter." Id. at 636. The breakdown was so severe that Holland repeatedly contacted the state courts asking that his attorney be removed from the case and even filed a complaint with the bar association. Those efforts met with no success. Id. at 636-43.

Further, Holland wrote to his attorney, informing him that, if the Florida Supreme Court denied relief, the attorney must quickly seek relief in federal court before the deadline for doing so expired. Ignoring those letters, the attorney failed even to inform Holland when the Florida

Supreme Court denied relief, much less file a timely federal application to preserve Holland's rights. Id. at 637-39.

When he finally contacted Holland, the attorney explained that he planned to file a petition for a writ of certiorari with the United States Supreme Court. Holland immediately responded to that letter, correctly explaining to his attorney that such an application would not toll the federal limitations period. The attorney then later wrote Holland, incorrectly stating that the federal deadline had passed before the attorney was even appointed in the state proceedings. Holland again immediately responded, pointing out the attorney's legal errors in calculating the deadline and begging him to file a federal application without delay. The attorney neither responded to that letter nor filed a federal application. Id. at 640-42.

The facts in the instant case are significantly less egregious. Here, counsel's office staff simply initially filed the application with the wrong Court of Appeal. That error obviously resulted from nothing more than garden-variety negligence, and, as such, simply does not qualify as an "extraordinary circumstance" warranting equitable tolling. See Holland, 560 U.S. at 651-52; see also Rivas v. Fisher, 687 F.3d 514, 538 (2d Cir. 2012) ("[I]n order to rise to the level necessary to constitute an 'extraordinary circumstance,' for purposes of tolling § 2254's limitation period, attorney negligence must be so egregious as to amount to an effective abandonment of the attorney-client relationship."); Hutchinson v. Florida, 677 F.3d 1097, 1100 (11th Cir. 2012) ("If attorney miscalculation, error, or negligence were enough for equitable tolling, the § 2244(d) statute of limitations would be tolled to the brink of extinction because in practically every case where there is a failure to meet the filing deadline an attorney is at fault.").

Further, while it may seem harsh to fault petitioner for his counsel's error, it must be remembered that a client is normally held accountable for and bound by the errors of his counsel.

That general rule is true even for habeas corpus petitioners. See Maples v. Thomas, 565 U.S. 266, 280-81 (2012) ("[T]he attorney is the prisoner's agent, and under well-settled principles of agency law, the principal bears the risk of negligent conduct on the part of his agent. Thus, when a petitioner's postconviction attorney misses a filing deadline, the petitioner is bound by the oversight …." (citations and quotation marks omitted)).

Moreover, in any event, it must be noted that counsel's error in this case in no way "prevented" petitioner from seeking timely federal relief. As already explained, despite counsel's error, petitioner still had two hundred twenty-four (224) days of his limitations period remaining even after the Louisiana Supreme Court denied relief on April 6, 2018. He does not identify any obstacle that "prevented" him from seeking federal relief during that extended period of time.[24]

Finally, to be entitled to equitable tolling, it is clear that that a prisoner must still pursue his rights diligently despite his purported extraordinary circumstances. Tsolainos v. Cain, 540 F. App'x 394, 398 (5th Cir. 2013). Here, however, petitioner inexplicably waited an additional three hundred forty-six (346) days to file his federal habeas corpus application relief after the Louisiana Supreme Court denied him post-conviction relief. That fact alone is sufficient to doom his bid for equitable tolling. See Koumjian v. Thaler, 484 F. App'x 966, 969 (5th Cir. 2012) (holding that the petitioner was not diligent when, "even if we were to subtract the time" of the alleged extraordinary circumstances, his delay in seeking federal relief "would still exceed four and a half

---

[24] Further, the Court notes that petitioner also had another vehicle available to him to protect his rights once his attorney's error came to light. In Pace v. DiGuglielmo, 544 U.S. 408 (2005), the Supreme Court noted that when it is unclear whether a petitioner's state filing is timely so as to qualify him for § 2244(d)(2) tolling, he may ensure his compliance with his federal filing deadline simply "by filing a 'protective' petition in federal court and asking the federal court to stay and abey the federal habeas proceedings until state remedies are exhausted." Id. at 416. The United States Fifth Circuit Court of Appeals has held that where, as here, a petitioner "could have elected to file a protective federal petition and request a stay, we hold that he was not *prevented* from asserting his rights, and that *equitable tolling does not apply*." Madden v. Thaler, 521 F. App'x 316, 323 (5th Cir. 2013) (emphasis added).

months"). "Equitable tolling 'is not intended for those who sleep on their rights.'" Tsolainos, 540

F. App'x at 398 (quoting Mathis v. Thaler, 616 F.3d 461, 474 (5th Cir. 2010)).

      For all of these reasons, petitioner clearly is not entitled to equitable tolling.

      Lastly, the Court notes that a petitioner can overcome the AEDPA's statute of limitations

by making a convincing claim of "actual innocence" under McQuiggin v. Perkins, 569 U.S. 383

(2013). In Perkins, the United States Supreme Court held:

> This case concerns the "actual innocence" gateway to federal habeas review
> applied in Schlup v. Delo, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995),
> and further explained in House v. Bell, 547 U.S. 518, 126 S.Ct. 2064, 165 L.Ed.2d
> 1 (2006). In those cases, a convincing showing of actual innocence enabled habeas
> petitioners to overcome a procedural bar to consideration of the merits of their
> constitutional claims. Here, the question arises in the context of 28 U.S.C. §
> 2244(d)(1), the statute of limitations on federal habeas petitions prescribed in the
> Antiterrorism and Effective Death Penalty Act of 1996. Specifically, ... can the
> time bar be overcome by a convincing showing that [the petitioner] committed no
> crime?
>      We hold that actual innocence, if proved, serves as a gateway through which
> a petitioner may pass whether the impediment is a procedural bar, as it was in
> Schlup and House, or, as in this case, expiration of the statute of limitations. We
> caution, however, that tenable actual-innocence gateway pleas are rare: "[A]
> petitioner does not meet the threshold requirement unless he persuades the district
> court that, in light of the new evidence, no juror, acting reasonably, would have
> voted to find him guilty beyond a reasonable doubt." Schlup, 513 U.S., at 329, 115
> S.Ct. 851; see House, 547 U.S., at 538, 126 S.Ct. 2064 (emphasizing that the Schlup
> standard is "demanding" and seldom met).

Perkins, 569 U.S. at 386.

      Petitioner has not invoked Perkins. However, in the event he does so in any objections to

this Report and Recommendation, the undersigned finds that he has not made the showing required

under Perkins for the following reasons.

      Here, petitioner was convicted of three counts of armed robbery. Under Louisiana law,

"[t]o convict a defendant of armed robbery, the state is required to prove: (1) a taking (2) of

anything of value (3) from the person or in the immediate control of another (4) by the use of force

of intimidation (5) while armed with a dangerous weapon." State v. Clark, 107 So. 3d 644, 650 (La. App. 2d Cir. 2012), writ denied, 113 So. 3d 210 (La. 2013). See La. Rev. Stat. Ann. § 14:64(A) ("Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon."). "Property that is taken is considered under the victim's control when the victim could have prevented the taking had he not been subjected to the robber's violence or intimidation. The State need not prove that the property taken was owned by the victim, but only that the accused was not the owner and the victim had a greater right to the item than the accused." State v. Brown, 173 So.3d 1262, 1275 (La. App. 5th Cir. 2015) (citation omitted), writ denied, 207 So. 3d 403 (La. 2016). A box cutter qualifies as a dangerous weapon for the purposes of the armed robbery statute. State v. Johnson, 121 So. 3d 1251, 1254-55 (La. App. 2d Cir. 2013), writ denied, 134 So. 3d 1194 (La. 2014).

In assessing a petitioner's claim of actual innocence, a court normally first examines the evidence presented at trial and on which the conviction was based. See, e.g., Johnson v. Cain, Civ. Action No. 14-543, 2015 WL 4528889, at *3 (E.D. La. July 27, 2015), aff'd, 667 F. App'x 474 (5th Cir. 2016); Lyles v. Tanner, Civ. Action No. 13-655, 2014 WL 4674673, at *6 (E.D. La. Sept. 17, 2014). In the instant case, the Louisiana Fifth Circuit Court of Appeal summarized that evidence as follows:

> At trial, the State presented evidence of two separate armed robberies of GameStop stores located in Jefferson Parish: (1) an April 12, 2009 armed robbery of Nancy Pichoff and Stephanie Ashley at the GameStop located on Manhattan Boulevard; and (2) an April 19, 2009 armed robbery of Daniel Gaudet at the GameStop located on Barataria Boulevard.
> Ms. Pichoff's testimony was presented to the jury via videotaped testimony. Ms. Pichoff testified that on Easter Sunday in April of 2009, she and her co-worker Stephanie were working at the GameStop on Manhattan Blvd. She testified that as she was locking the door for closing time around 6:00 p.m., a tall man armed with a box cutter, wearing a white t-shirt, and a towel covering his face walked into the

store and told her to "get behind the register." Ms. Pichoff walked behind the register where Stephanie was already standing.

Once she was behind the register, the perpetrator ordered Ms. Pichoff to open the drawer as he held a box cutter; however, she was unable to open her register because she forgot her password. As a result, Stephanie opened both of the store's registers and handed all of the bills to the perpetrator, which he then placed into a mesh backpack. Ms. Pichoff also testified that the perpetrator took all of the money from the store's safe, as well as other items including Wii and PlayStation 3 game consoles and games, all of which he placed into the mesh backpack, with the exception of the PlayStation 3 console. She explained that although the perpetrator did not physically touch anyone in the store, he threatened her with the box cutter. Before leaving the store, Ms. Pichoff testified that the perpetrator ordered her and Stephanie to walk to the back of the store as he exited, at which point, she locked the front door and Stephanie called the police. Ms. Pichoff also stated that the store was not equipped with video-surveillance cameras, and that she told the officers that she would not be able to identify the man who robbed the store because he was covered from head to toe.

At trial, Detective Russell Varmall of the Jefferson Parish Sheriff's Office Robbery Division testified that he was the lead detective who investigated the April 12, 2009 robbery of the GameStop on Manhattan Blvd. Detective Varmall spoke separately to the two victims, Ms. Ashley and Ms. Pichoff. He testified that he obtained a physical description of the perpetrator as a tall black male wearing a white shirt, grey sweatpants, a dark hat, a cloth covering the lower portion of his face, and a glove, and carrying a blue box cutter and a black mesh backpack. Detective Varmall explained that he did not have any named suspects or a suspect vehicle at that time.

The State called Daniel Gaudet, a former store manager of the GameStop located on Barataria Blvd., to testify at trial as to the robbery at that location. Mr. Gaudet testified that on April 19, 2009, he was working at the GameStop with his co-worker Samantha Nicholson close to closing time at about 5:30 p.m., when the perpetrator approached the counter and told him "Put the money in the bag." Mr. Gaudet testified that the perpetrator pulled out a box cutter with a blue handle. Mr. Gaudet then opened both registers and put all of the bills into the perpetrator's bag, and the perpetrator left. He testified that customers were present in the store during the robbery, but stated that he did not believe that the customers were aware of the robbery at the time it occurred.

Mr. Gaudet testified that the perpetrator was a tall man armed with a box cutter with a blue handle, wearing a dark hat, white t-shirt and a white cloth over his face. Mr. Gaudet gave a statement to the officers who arrived on the scene, and provided them with a copy of the store's video-surveillance camera, which was played for the jury. Although Mr. Gaudet testified that he was unable to identify the perpetrator of the robbery, he testified that there was nothing "inconsistent" with defendant's physical characteristics and with those of the perpetrator.

The State also called Detective Nathan Penton of the Jefferson Parish Sheriff's Office to testify about the robbery of the GameStop on Barataria Blvd. Detective Penton testified that on April 19, 2009, he responded to a call for service

at the GameStop on Barataria Blvd., where two GameStop employees informed him that they had been robbed. Detective Penton obtained a description of the suspect from them, which he described as a black male, approximately 6 feet and 3 inches tall and weighing between 180 pounds to 220 pounds, with moles or some type of marks around his eyes, wearing a blue baseball cap with white lettering, a white shirt, and grey sweatpants. His eyes were brown and his hair was dark brown. He testified that both victims provided him with the same basic description, but that the female victim gave a more detailed description.

Detective Varmall was assigned as the follow-up detective on the Barataria Blvd. GameStop robbery due to the similarities between the description of the suspect and the robbery, and the description of the suspect and the robbery of the Manhattan Blvd. GameStop. Specifically, Detective Varmall believed that the two robberies were connected due to the fact that both robberies occurred near closing time and the similar description of the suspect.

Detective Varmall testified that another detective in his unit contacted GameStop's loss prevention officer for the Southeastern Louisiana region, and determined that there had been multiple robberies of GameStop stores located on the Northshore of Louisiana, including Walker, Denham Springs, Covington, and Slidell. After his supervisor contacted the St. Tammany Parish Sheriff's Office, Detective Varmall determined that the St. Tammany Parish GameStop armed robberies were consistent with the Jefferson Parish robberies. On April 20, 2009, Detective Varmall received word from the St. Tammany Sheriff's Office that they had arrested a suspect described as a black male at a GameStop in Mandeville. The suspect was later identified as defendant, Gregory Reaux.

Detective Varmall stated that he and Sgt. John Carroll arrived at the St. Tammany Investigations Bureau at approximately 11:30 p.m. to conduct an interview of defendant. He explained that defendant had already been advised of his Miranda rights and questioned by the St. Tammany Parish Sheriff's Office. Detective Varmall interviewed defendant for approximately one to one and a half hours, during which time defendant was cooperative, but denied any involvement in the robberies. Detective Varmall testified that he never threatened defendant to confess, physically touched him, or offered him anything of value in exchange for his confession.

Detective Varmall ended the interview and left to assist the St. Tammany officers in executing a search warrant of defendant's residence in Hammond, Louisiana. However, while en route to defendant's residence, he received a call from the St. Tammany Parish Sheriff's Office that defendant confessed to both robberies in Jefferson Parish. Once he returned to the St. Tammany Investigations Bureau, Detective Varmall gave defendant a still photograph of the video surveillance taken from the robbery of the Barataria Blvd. Game Stop, which defendant signed identifying himself as the perpetrator in the photograph.

The State called Lieutenant Patrick McCormick of the St. Tammany Parish Sheriff's Office to the stand. Lieutenant McCormick testified that on the day of defendant's April 20, 2009 arrest, he and Deputy Noel Forrester were conducting surveillance of the GameStop located in Mandeville, as it was the only one of the three GameStops in St. Tammany Parish that had not yet been robbed. He was

given a description of the suspect as a tall black male armed with a box cutter, wearing a backpack, a baseball cap, a white t-shirt and grey sweatpants. He stated that they arrived at the GameStop near the store's closing time because the other robberies had occurred near closing.

Lieutenant McCormick testified that he observed a tall black male, later identified as defendant, wearing a white t-shirt, light grey pants and a baseball cap walking through a service alley between the GameStop and a nearby dental office. He observed defendant peer into the GameStop area, and then step back towards the dental office and out of the lit area when someone exited one of the businesses. He described defendant's behavior as "odd." When Lieutenant McCormick's Nextel began beeping, defendant realized he was there. He explained that defendant gave a "deer in headlights" expression, then turned and briskly walked away.

Lieutenant McCormick then contacted Deputy Forrester, who detained and questioned defendant at a nearby red light. As he approached Deputy Forrester and defendant, he observed defendant shifting, which he explained indicated a fight or flight response. Based on this response, Lieutenant McCormick placed defendant in handcuffs and advised him of his Miranda rights. Lieutenant McCormick also located defendant's vehicle, a white Monte Carlo, at a nearby gas station. He explained that defendant's vehicle matched the description of the vehicle connected to the previous GameStop robberies.

Deputy Forrester testified that he was present at the time of defendant's arrest near the GameStop in Mandeville on April 20, 2009. When Deputy Forrester exited his vehicle, defendant was behind the GameStop, and he asked defendant if he would come speak with him. Defendant agreed to speak with him, but appeared nervous. Deputy Forrester explained that defendant appeared to "dance" back and forth on his feet and look around for a place to flee. At that time, Lieutenant McCormick walked from behind defendant and placed him in handcuffs. As Lieutenant McCormick located defendant's vehicle, Deputy Forrester conducted a pat-down search of defendant and recovered a blue box cutter that fell from defendant's waistband onto the ground. Deputy Forrester identified a black mesh backpack recovered from defendant at the time of his arrest, as well as the box cutter he recovered during the pat-down of defendant. Lieutenant McCormick placed defendant under arrest for attempted armed robbery, and defendant was later placed under arrest for the prior GameStop robberies in St. Tammany Parish.

The State also called Lieutenant George Cox of the St. Tammany Sheriff's Office to testify as to the robbery of a GameStop located in Covington, Louisiana on April 18, 2009. Lieutenant Sean Mclain of the Slidell Police Department also testified on behalf of the State as to the robbery of a GameStop located in Slidell, Louisiana, on April 17, 2009. Lieutenant Cox and Lieutenant Mclain both explained that when they received their respective cases on April 20, 2009, they were both made aware of similar robberies of GameStop locations throughout the New Orleans area and in Walker, Louisiana. They both stated that the method of operation and the physical characteristics of the perpetrator were almost identical, which suggested that the robberies were committed by the same person. Lieutenant Mclain further stated that the officers of the Slidell Police Department observed the

15

perpetrator walking from the GameStop in Slidell to a white Monte Carlo on a surveillance video from a nearby Academy Sports.

On the evening of April 20, 2009, Lieutenant Cox and Lieutenant Mclain were both informed that a suspect had been taken into custody for an attempted robbery of a GameStop. They first encountered defendant in the interview room at the Major Crimes office in Covington at approximately 9:30 p.m. that evening. Lieutenant Cox advised defendant of his Miranda rights by reading a standardized Statement of Miranda Rights/Waiver of Rights Form to defendant, which defendant signed. Lieutenant Cox testified that he did not subject defendant to threats, force, pain, starvation or sleep deprivation. Lieutenant Mclain also testified that he did not threaten defendant. Lieutenant Cox took breaks and offered breaks to defendant, including offers of food and water, which defendant accepted.

Lieutenant Cox and Lieutenant Mclain both stated that defendant initially denied any involvement or knowledge of the GameStop robberies in St. Tammany Parish. After the interview had been conducted for approximately an hour, Detective Varmall and Sergeant Carroll of the Jefferson Parish Sheriff's Office interviewed defendant for approximately one and a half to two hours, during which time defendant continued to deny any involvement.

As the other officers left to execute search warrants of defendant's white Monte Carlo and of his residence in Hammond, Lieutenant Cox and Lieutenant Mclain continued to question defendant. They also both stated that defendant stated that he had obtained a Bachelor's Degree and was working toward a Master's Degree. In addition, Lieutenant Cox and Lieutenant Mclain testified that for the first time, they informed defendant of the locations where the robberies occurred, that they believed all of the robberies were committed by the same person, showed defendant still prints of the suspect involved in the Jefferson Parish robbery, and informed him that the officers were seeking a search warrant for defendant's vehicle. Lieutenant Cox and Lieutenant Mclain both stated that they did not present defendant with any specific details at that time, but that defendant asked what would happen with the different jurisdictions if he was in fact guilty. Eventually, defendant stopped answering their questions.

Lieutenant Cox and Lieutenant Mclain stated that they chose to discontinue the interview and began walking defendant to the jail to be booked with attempted robbery, at which point, defendant stated that he wanted to tell the truth and tell everything. Lieutenant Cox and Lieutenant Mclain stated that they then returned defendant to the interview room where they again advised him of his Miranda rights through the recorded statements form, which defendant signed. Defendant then confessed to all of the GameStop robberies, including the two Jefferson Parish robberies, and agreed to give a recorded statement. Defendant explained that each robbery was committed in the same manner, while carrying a backpack and box cutter, and wearing a mask. Defendant's recorded statement began at 4:07 a.m. on April 21, 2009 and concluded at about 4:42 a.m. that same day.

After defendant was transported to the Slidell jail, a correctional officer informed Lieutenant Mclain that defendant wanted to speak with him. Lieutenant Mclain stated that he advised defendant of his Miranda rights, and defendant signed another taped statement form indicating that he understood his Miranda rights.

Defendant then provided a second recorded statement on April 21, 2009, wherein he claimed that a second named individual was involved in the robberies. However, Lieutenant Mclain testified that there was nothing in his investigation that suggested a second subject was involved. After Lieutenant Cox informed defendant that he would investigate the second person involved, defendant recanted his second recorded statement and provided a third recorded statement on April 22, 2009, acknowledging that he was the only person involved. Prior to giving his third recorded statement, defendant executed another taped statement form indicating that he understood his Miranda rights.

In addition, Lieutenant Cox testified that the following items were recovered from defendant's vehicle as a result of the search warrant of his vehicle: Nintendo Wii points cards, a box from the GameStop store located in Walker, Louisiana, and a Wii videogame. Lieutenant Cox stated that defendant was also placed under arrest for the Covington, Slidell, and Jefferson Parish robberies.[25]

The United States Supreme Court has explained that, in order to assert a credible claim of actual innocence, a petitioner is required "to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." Schlup v. Delo, 513 U.S. 298, 324 (1995).

In the instant case, there was ample evidence of petitioner's guilt introduced at trial, and he has presented no new evidence whatsoever to show that he is actually innocent. Therefore, he cannot meet "the threshold requirement" for Perkins to apply, i.e. a showing that "'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" Perkins, 569 U.S. at 386 (quoting Schlup, 513 U.S. at 329). Accordingly, Perkins does not aid him.

---

[25] State v. Reaux, 165 So. 3d 944, 947-51 (La. App. 5th Cir. 2014) (footnote omitted); State Rec., Vol. 2 of 7. In a separate proceeding, petitioner was convicted of three counts of armed robbery and one count of attempted armed robbery for referenced the crimes committed in St. Tammany Parish. Gregory v. Reaux, No. 2014 KA 0330, 2014 WL 4667603 (La. App. 1st Cir. Sept. 19, 2014). He has been denied federal habeas corpus relief with respect to those convictions. Reaux v. Cain, Civ. Action No. 17-8690, 2018 WL 7824485 (E.D. La. July 3, 2018), adopted, 2019 WL 1326909 (E.D. La. Mar. 25, 2019).

Because petitioner is not entitled to further statutory tolling, and because he has not established that he is eligible for equitable tolling or that he is actually innocent, his federal application for habeas corpus relief had to be filed no later than **November 16, 2018**, in order to be timely. His application was not filed until **March 18, 2019**, and, therefore, it is untimely.

## **RECOMMENDATION**

It is therefore **RECOMMENDED** that Gregory Reaux's federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254 be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[26]

New Orleans, Louisiana, this __18th__ day of July, 2019.

**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**

---

[26] Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.